**JAMES RICHARDSON & SONS, Limited, et al., v. 158,200 BUSHELS OF NO. 1 NORTHERN MANITOBA WHEAT et al. No. 419.**

Circuit Court of Appeals, Second Circuit.
June 7, 1937.

608

Otto, Easterday & Warburton, of New York City (Henry E. Otto, and Samuel C. Otto, of New York City, of counsel), for appellants.

Foley & Martin, of New York City (Christopher E. Heckman, and James A. Martin, of New York City, of counsel), for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

The libelants are owners, as their interests may appear, of cargoes of wheat transported from Buffalo to New York on six canal barges under a contract of affreightment between James Richardson & Sons, Limited (for convenience hereafter referred to as Richardson) and W. E. Hedger Transportation Corporation (hereafter referred to as Hedger). Hedger having threatened to sell the wheat for freight charges, the libelants filed a possessory libel in rem against the cargoes and in personam against Hedger and the bargees of the six canal boats on which the cargoes were laden. Hedger intervened, claiming a maritime lien on the wheat for 80 per cent. of the agreed freight charges. The final decree awarded the libelants possession of the wheat on condition that they pay to Hedger the amount claimed for freight, and they have appealed on the ground that the imposition of this condition was erroneous.

The contract of affreightment, dated September 24, 1936, covered a much larger quantity of grain than the 158,200 bushels involved in the present libel. It provided that Hedger should furnish insurable canal tonnage for the transportation of approximately 1,000,000 bushels of wheat from the port of Buffalo to the port of New York, subject to New York Produce Exchange Canal Grain Charter Party No. 1. With respect to payment of freight this charter party provided:

"80% of the total freight is due and payable on arrival of boats at Destination, the balance, together with demurrage and towing and/or other proper charges is due and payable after delivery has been made and actual outturn weights ascertained, subject to deduction of shortage allowances, or other substantiated claims under this particular charter.

"If shortage amounts to more than 20%, carrier shall refund to the cargo owner any freight paid on any shortage in excess of said 20%.

"Freight is guaranteed and payable vessel or cargo lost or not lost."

It also provided: "Each boatload (or parcel, if less than a boatload) is to be deemed a separate charter."

The wheat was to be laden between October 15th and November 15th. About 460,000 bushels of it arrived in New York during the months of November and December, 1936. Merely for convenience of reference this will be called the first installment. The balance of the wheat, approximately 540,000 bushels (hereafter referred to as the second installment), became winter-bound in the State Barge Canal and did not reach the port of New York until April, 1937. The six barge loads which are the subject of the present possessory libel were part of the second installment; they arrived at New York on or about April 14th.

Disputes have arisen between the cargo owners and the carrier. In January 1937 Hedger filed in the District Court for the Eastern District of New York a libel claiming demurrage of nearly $27,000 on account of vessels which carried part of the first installment of wheat, and attached property owned by Richardson. The cargo owners answered the libel and furnished security; and on April 6, 1937, Richardson filed a cross-libel claiming damages of approximately $92,000 for breach of the contract of affreightment by reason of the detention of the second installment in the Barge Canal during the winter of 1936, which Richardson asserts to have been caused by the fault and neglect of Hedger. This libel and cross-libel were still pending, and no security had been posted by Hedger in the cross-libel, when the present appellants filed their possessory libel. They

offered to give Hedger security for the freight claimed, or to pay the amount thereof to a trustee, or to pay it to Hedger if Hedger would give a bond therefor, determination of ultimate liability to await decision of the issues raised in the prior libel and cross-libel. They contend that the court erred in directing that Hedger should get its freight upon delivery of the cargoes, and without providing any form of security for their claims against Hedger.

The appellants urge that the maritime lien for freight is not governed by the strict and technical rules of the common law but is to be dealt with upon equitable principles, Four Thousand Eight Hundred Eighty-Five Bags of Linseed, 1 Black (66 U.S.) 108, 114, 17 L.Ed. 35, and that common justice demands that a cargo owner be not required to pay freight in cash while the carrier is owing him a larger sum for damages in the same transaction, The Ciampa Emilia, 39 F. 126 (D.C.S.D.N.Y.). The argument is further buttressed by quotations from Wellman v. Morse, 76 F. 573, 578, 579 (C.C.A.1); Frederick H. Leggett & Co. v. 500 Cases of Tomatoes, 15 F.(2d) 270 (C.C.A.2); Bradstreet v. Heran, Fed. Cas.No.1,792, 1 Abb.Adm. 209; United States v. Wilder, Fed.Cas.No.16,694; and a reference to Admiralty Rule 50, 26 U.S. C.A. following section 723, and to Admiralty Rule 17 of the Eastern District of New York.

 When the contract under which the goods are carried contains no special stipulation on the subject, the vessel owner is bound to discharge the cargo before he can enforce payment of freight, as Judge Putnam says in the Wellman Case, supra. Under such circumstances, or where the liability of the shipper is for a sum uncertain (e. g., for general average contribution), the principles upon which the libelants rely may be applicable; but, if the parties have expressly agreed that a percentage of the freight shall be paid "on arrival of boats at destination" "cargo lost or not lost" and the balance only be retained as security for the "deduction of shortage allowances, or other substantiated claims under this particular charter," we see no reason to apply them. The cargo owner has expressed his willingness to look only to the retained portion of the freight (plus such remedies by suit as the law gives him) to protect his enforcement of claims for damages arising out of a

breach of contract by the carrier. Why should the court make for the shipper a different and more favorable contract than the one he was content to make for himself? No adequate reason has been advanced and no authority cited which seem to us to justify so doing. Compare cases enforcing contracts providing for prepayment of freight though the goods are lost. Allanwilde Corporation v. Vacuum Oil Co., 248 U.S. 377, 385, 39 S.Ct. 147, 63 L.Ed. 312, 3 A.L.R. 15; National Steam Nav. Co. v. International Paper Co., 241 F. 861 (C.C.A.2). We think the decree appealed from was correct.

Decree affirmed.