## UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION v. TEXAS STAR FLOUR MILLS.

(Circuit Court of Appeals, Fifth Circuit.
March 23, 1926. Rehearing Denied
April 22, 1926.)

No. 4581.

1. **United States** ⬅️52½, New, vol. 19A Key-No. Series—United States Shipping Board Emergency Fleet Corporation cannot escape liability, because acting as agent for United States, where record shows it did not act as such agent in particular transaction.

United States Shipping Board Emergency Fleet Corporation cannot escape liability, because acting as agent of the United States, where record does not show that it acted as such agent in that particular transaction.

2. **United States** ⬅️52½, New, vol. 19A Key-No. Series.

Liability incurred by United States Shipping Board Emergency Fleet Corporation as carrier is subject to be enforced by suit against it.

3. **Shipping** ⬅️142.

Provision in ship's bill of lading limiting time for bringing suit will not be given effect of barring suit, unless requirement was reasonable.

4. **Shipping** ⬅️142—Provision in ship's bill of lading limiting liability to cases where suit is brought within six months after delivery to carrier held unreasonable as applied to claim for damages to flour shipped to Cuba and not delivered until five months after delivery to carrier, shipper being resident of Texas.

Provision in ship's bill of lading limiting liability to cases where suit was commenced within 6 months from delivery of goods to carrier *held* unreasonable as for damages to flour, which was not delivered until five months after delivery to carrier, allowing shipper resident of Texas only one month to ascertain condition of flour in Cuba and to make investigation as to cause of damage.

5. **Shipping** ⬅️125—Carrier's delay of five months in transporting flour from Texas to Cuba, reasonable time being about two weeks, held progressive cause of damage to flour caused by weevil, ordinary period for germination of weevil in flour being sixty days.

Carrier's delay of five months in carrying flour from Texas to Cuba, where reasonable time was about two weeks, *held* to have been progressive cause of damage to flour caused by weevil; ordinary period for germination of weevil in flour being about sixty days under conditions prevailing in such climate.

6. **Shipping** ⬅️141(1)—Provision in ship's bill of lading, exempting from liability for damage before loading and after leaving vessel, and for damage caused by heating, decay, or other elements, held not to exempt carrier from liability for damage to flour caused by unwarranted delay between time of receipt and acceptance and time of loading.

Provision in ship's bill of lading exempting carrier from liability for damage to cargo until actually loaded for transportation and after leaving vessel's tackles, and for damages by heating, or effects of climate, decay, putrefaction, ferment, rust, sweat, or by nature of goods or cargo, *held* not to exempt carrier from liability for damage to flour caused by working of weevil, and due to an unwarranted delay between time it was received and time it was loaded in vessel.

7. **Shipping** ⬅️125—Contract for freight space imposes on carrier implied obligation to have vessel proceed within reasonable time, and to exercise ordinary care for protection of cargo from time of acceptance.

Contract for freight space imposes on carrier implied obligation to have vessel proceed

from port of loading within reasonable time, and to exercise ordinary care for safety and protection of cargo from time it was accepted for shipment.

**8. Shipping** ⊂⟩106.

Carrier is liable for breach of contract obligation incurred before ship's bills of lading were signed.

**9. Shipping** ⊂⟩125—It is to be inferred that flour accepted for shipment without notifying shipper that shipment would be delayed would not be subjected to destructive delay before being started on voyage.

Where carrier accepted flour for shipment without notifying shipper that shipment of it would be delayed, it was to be inferred that flour would not be subjected to destructive delay before it was started on its voyage.

**10. Shipping** ⊂⟩141(1)—Carrier of perishable freight fails in its proper care by reasonably avoidable delay in movement, and could not by contract obtain relief from liability for loss or damage from such fault or failure (Comp. St. § 8029).

Carrier of perishable freight fails in its proper care by reasonably avoidable delay in movement resulting in injury or ruin, and under Comp. St. § 8029, could not by contract obtain relief from liability for loss or damage arising from such fault or failure.

**11. United States** ⊂⟩110—Action against United States Shipping Board Emergency Fleet Corporation for damages for breach of contract of affreightment held not such suit in admiralty as would prohibit recovery of interest (Admiralty Act, § 3 [Comp. St. Ann. Supp. 1923, § 1251¼b]).

Action against United States Shipping Board Emergency Fleet Corporation for damages for breach of obligations imposed by contract of affreightment was not a suit in admiralty, so as to come within provisions of Admiralty Act, § 3 (Comp. St. Ann. Supp. 1923, § 1251¼b), limiting recovery of interest.

In Error to the District Court of the United States for the Southern District of Texas; Joseph C. Hutcheson, Judge.

Action by the Texas Star Flour Mills against the United States Shipping Board Emergency Fleet Corporation. Judgment for plaintiff, and defendant brings error. Affirmed.

H. M. Holden, U. S. Atty., of Houston, Tex., for plaintiff in error.

J. Newton Rayzor, of Houston, Tex. (Lockhart, Hughes, Lockhart & Rayzor, of Galveston, Tex., and J. Newton Rayzor, of Houston, Tex., on the brief), for defendant in error.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

WALKER, Circuit Judge. This was an action by the defendant in error (herein called the shipper), whose principal place of business is at Galveston, Tex., against the plaintiff in error, United States Shipping Board Emergency Fleet Corporation (herein called the carrier), to recover the alleged amount of damage to flour shipped on a vessel of the carrier. The petition contained allegations to the following effect:

The carrier through its agent on December 15, 1919, confirmed engagement of freight room for the shipper for 33 tons of flour, "shipment from ship side Galveston to Nuevitas via Havana or Santiago, to be delivered to suit steamer." That instrument contained the following: "This contract is made upon the express condition that it is subject to all the clauses and conditions in the ocean bill of lading used by the vessel, which bill of lading is made a part of this contract and copy of same shall be furnished on application."

By a similar instrument dated December 18, 1919, the carrier confirmed engagement of freight room for 50 tons of flour. Pursuant to those freight engagement contracts the shipper on December 18 and December 22, 1919, delivered to three cars 85 tons of flour in good order and condition, and the bills of lading evidencing the shipment of the flour from the shipper's mill to the dock of the carrier's agent were delivered to the carrier's agent and were received by him on the dates of the issue of such bills of lading, and the cars containing the flour were in the exclusive possession and control of the carrier from those dates until delivery was made by the carrier to the steamship Gibara as stated below. One of those cars was unloaded at the carrier's dock at Galveston on January 10, 1920, and the other two cars were unloaded there on January 27, 1920, and on those dates the carrier delivered to the shipper bills of lading (copies of which were attached to the petition), covering the flour for shipment by the steamship Lake Sanford to Havana, or to Santiago, and then by connecting carrier to Nuevitas, Cuba. The flour remained on the carrier's dock at Galveston until February 25, 1920, when the flour left Galveston on the Lake Sanford. The flour arrived at Santiago on March 7, and was delivered by the carrier to the steamship Gibara on April 19, 1920, which transported it to Nuevitas, arriving at that place on May 18, 1920.

The carrier was negligent in failing to remove the flour from the cars with reasonable promptness, in allowing it to remain on the dock from the time it was unloaded from the cars until it was shipped from Galves-

ton, and in delaying the transit of the flour from Galveston to Nuevitas. The reasonable time within which the carrier should have carried the flour after its receipt at Galveston was not more than two or three weeks. Said negligence of the carrier caused the flour to deteriorate, in that, by the unreasonable delay at Galveston and in transit, weevils operated in the flour and damaged it, and by being exposed to dampness for so long a period of time the flour became musty and badly decayed.

By written stipulation a jury was waived. The court, after overruling exceptions to the petition, made special findings of fact, and rendered judgment in favor of the shipper for the amount of the difference between the market value of the flour when it should have arrived at Nuevitas and its value when it arrived at that place, with interest on that sum at 6 per centum per annum from January 15, 1920.

[1, 2] There is no merit in the contention that the liability asserted could not be enforced against the carrier because in the transaction in question it acted as agent of the United States. The record does not show that it acted as such agent in those transactions. Liability incurred by it as a carrier is subject to be enforced by suit against it. Sloan Shipyards v. U. S. Fleet Corp., 42 S. Ct. 386, 258 U. S. 549, 66 L. Ed. 762.

[3, 4] Each of the ship's bills of lading contained the following: "No suit or proceeding to recover for or upon any claim or demand shall be maintained against the carrier or vessel or owners thereof, unless commenced within six months after delivery of the goods to the carrier, and the lapse of such period shall be deemed a complete bar to recovery in any such suit or proceeding not sooner commenced, notwithstanding the carrier may be a nonresident or a foreign corporation."

By exception to the petition the carrier set up that provision as a bar to the suit, which was not brought within six months after the delivery of the flour to the carrier. The quoted provision should not be given the effect of barring the suit unless under the circumstances of the case the requirement was reasonable. The Queen of the Pacific, 180 U. S. 49, 21 S. Ct. 278, 45 L. Ed. 419; Green Star S. S. Co. v. Nanyang Bros. Tobacco Co. (C. C. A.) 3 F.(2d) 369. The flour was delivered at Nuevitas on May 18, 1920, five months after part of it was delivered to the carrier. The six months from the date of the delivery to the carrier of the flour expired one month after it reached Nuevitas.

We have no hesitation in concluding that one month was less than a reasonable time to allow the shipper, located at Galveston, Tex., to ascertain the condition of the flour when it was delivered at Nuevitas, Cuba, to make investigation as to the cause of damage and liability therefor, and to bring suit. The exception in question was properly overruled.

[5] The court found to the following effect: When the flour was loaded on the cars and came under the carrier's control on December 18 and 22, 1919, it was as it was when it came from the mill, it had not been stored and was free from weevil. At that time there was present in the flour the germ of weevil, which infests all flour, especially in Southern climates. The ordinary period for the germination of weevil in flour, under the conditions prevailing when the flour in question was placed on the cars at Galveston, is about 60 days. Weevil damage is not sudden, but is progressive after it has once begun. The germination of the weevil in the flour began between the time the carrier got control of it in December, 1919, and the arrival of it at Santiago on March 7, 1920. The carrier accepted the flour without notifying the shipper that any delay in the shipment and carrying of it was expected. The reasonable time for transporting cargo from Galveston to Santiago, Cuba, was about two weeks. The carrier's delay set in motion the progressive cause of the damage, and it is responsible for that damage. The carrier invoked the following provisions of the bills of lading:

"The carrier's responsibility in respect of the goods as a carrier shall not attach until the goods are actually loaded for transportation upon the vessel, and shall terminate, without notice, as soon as the goods leave the vessel's tackles at destination or other place where the carrier is authorized to make delivery or end its responsibility. Any responsibility of the carrier in respect of the goods attaching prior to such loading or continuing after leaving the vessel's tackles as aforesaid whether the goods are in course of lighterage by the carrier, or however else the same may be situated, shall be the same as that only of a warehouseman, without liability on the part of the carrier, except for want of ordinary care; and all conditions, exemptions, exceptions, and limitations of the liability of the carrier contained in this contract shall be deemed to apply also to such warehouseman's liability as well as to the liability as a carrier. * * *

"The carrier shall not be liable, as car-

rier or otherwise, for any loss, damage, delay, or default, whether occurring during transit or before, or after or during or while awaiting loading, transshipment, discharge, delivery, or other disposition of the goods, or on board or in lighters or craft, or on wharf or in warehouse, at any port or place, occasioned by any of the following excepted causes, throughout this contract always excepted, by causes beyond the carrier's reasonable control, by dangers or accidents of the sea or other waters and navigation or transportation of whatsoever nature or kind, * * * by heating, heat of holds, or effects of climate, * * * by·rain or spray, frost, decay, putrefaction, ferment, rust, sweat, * * * by nature of the goods or cargo."

[6-10] Nothing in the just quoted provisions has the effect of exempting the carrier from liability for damage to the flour due to unwarranted delay between the time it was received and accepted by the carrier and the time it was loaded in the vessel. Under the contracts for freight space for the flour the carrier was obligated to the shipper from the time the flour was accepted and prior to the loading of it on the vessel. Those contracts imposed on the carrier implied obligations to have the vessel which was to carry the flour proceed from the port of loading within a reasonable time and to exercise ordinary care for the safety and protection of the flour from the time it was accepted by the carrier for shipment. The carrier was liable for a breach of a contract obligation which was incurred before the bills of lading were signed. The Caledonia, 15 S. Ct. 537, 157 U. S. 124, 39 L. Ed. 644; Boak & Co. v. United States Shipping Board Emergency Fleet Corporation, 11 F.(2d) 523, U. S. Circuit Court of Appeals, Fifth Circuit, present term.

It was not consistent with the exercise of ordinary care for the carrier, without notifying the shipper that any delay in the shipment or carriage of the flour was anticipated, to delay the shipment for such a length of time as involved exposure of the flour to weevil damage.· From the carrier's acceptance of the flour without notifying the shipper that the shipment of it would be delayed, it was to be inferred that the flour was "delivered to suit steamer" within the meaning of the engagements for freight room, and that it would not be subjected to· destructive delay before it was started on its voyage. A carrier of perishable freight fails in the proper care and custody of it by reasonably avoidable delay in the movement of it resulting in the injury or ruin of it. The carrier could not by contract obtain relief from liability for loss or damage arising from such fault or failure. U. S. Comp. St. § 8029. The carrier was liable for damage due to such delay, which was not found to have been excusable or reasonably unavoidable.

[11] .It was contended that the allowance of 6 per centum per annum interest on the amount of the ascertained damage was in violation of the provision as to interest in section 3 of the Suits in Admiralty Act, 41 Stat. 526 (Comp. St. Ann. Supp. 1923, § 1251¼b). This suit was not one in admiralty, but was an action at law by a shipper against a carrier for damages for a breach of obligations imposed by a contract of affreightment. We do not think that the provision invoked is applicable to the instant case. John G. Wright & Co. v. United States S. B. E. F. Corp. (D. C.) 285 F. 647.

*The judgment is affirmed.*