M/V AMERICAN QUEEN, a United States Vessel, and Caribe Fishing Company, Inc., a Puerto Rican corporation, Plaintiffs-Appellants,

v.

SAN DIEGO MARINE CONSTRUCTION CORP., and Campbell Industries, California corporations, Defendants-Appellees.

No. 81–5927.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 1982.

Decided June 24, 1983.

---

Peter Murphy, Maloney, Chase, Fisher & Hurst, San Francisco, Cal., for plaintiffs-appellants.

Daniel C. Minteer, Lillick, McHose & Charles, San Diego, Cal., for defendants-appellees.

Before GOODWIN, HUG, and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

Appellants, M/V *American Queen* and Caribe Fishing Company (hereinafter collectively "Caribe") brought suit against two marine repair and construction companies alleging improper service and repair of the *American Queen*'s rudder, which disabled the vessel while at sea. Defendants sought and were granted summary judgment on the basis of a limitation of liability clause in the contract for maintenance and repairs. We find the grant of summary judgment appropriate and affirm.

FACTS

In October 1977, Manuel Caboz brought the vessel *American Queen* to San Diego, California, to be dry-docked for inspection and repairs as required for insurance purposes. Caboz was master of the *American Queen* and president of Caribe Fishing Company, corporate owner of the *American Queen*. In San Diego, Caboz obtained bids from San Diego Marine Construction Corp. and Campbell Industries, the only facilities available in the San Diego area which were properly outfitted for the required work. On the basis of the bids, Caboz chose San Diego Marine for the dry dock. At the time, San Diego Marine was a subsidiary of Campbell, but the companies maintained separate repair facilities.

As the work progressed, San Diego Marine periodically presented handwritten documents outlining proposed work, and Caboz wrote his assent to the proposed repairs on these documents. On or about November 1, 1977, San Diego Marine presented a proposal for removal and reinstallation of the ship's rudder; Caboz assented as usual. This work was done between November 1, 1977 and about November 15, 1977.

After the rudder work was done, San Diego Marine presented Caboz with its standardized, preprinted ship repair contract. Caribe asserts that Caboz believed it necessary to sign the form to get redelivery of the vessel and that Caboz was unaware of the limitations provision therein. Caboz

admits, however, that he knew he would have to sign a contract at some point in the work and that it was a common practice for the contract to be signed after work began. Caboz signed the contract on November 15, 1977; the contract was backdated to October 12, 1977. The contract incorporated by reference all work done prior to the actual signing and contained an integration clause.

In November 1978, Caboz again brought the vessel to San Diego Marine for repairs, including work on or around the ship's rudder. On July 5, 1979, the *American Queen* became disabled at sea when the rudder separated from the rudder stock. Caribe alleges that the rudder problem was due to San Diego Marine's improper installation. Caribe asserts that the defect in the rudder could not be visually detected, either at sea or while the vessel was in dry dock.

Caboz gave verbal notice to Campbell of the rudder problem the day of the disabling. The vessel was towed to San Diego, where Campbell repaired the rudder. Approximately four months later, Caribe filed this action alleging various causes of action, all based on San Diego Marine's alleged improper service.[1] On April 20, 1981, San Diego Marine and Campbell filed a motion for summary judgment based on a provision of the contract limiting the time for notice and suit on negligent repairs. To have a valid claim, the contract required that Caribe give written notice of the claim within sixty days of, and file suit within six months of, *redelivery* of the vessel. Before hearing on the motion, appellants filed a motion for leave to file an amended complaint to add claims against San Diego Marine and Campbell for fraud and negligent breach of a duty to disclose. The trial court denied leave to amend. It then granted San Diego Marine's and Campbell's motions for summary judgment and awarded them attorneys' fees.

Caribe raises numerous issues on appeal, including whether the exculpatory clause was reasonable and enforceable as to these

---

1. The complaint originally prayed for a declaratory judgment that appellants owed Campbell nothing for the repairs to the rudder on July 5, 1979. Campbell counterclaimed for these repairs. The counterclaim was fully settled in May 1980.

parties and to these causes of action; whether the court properly admitted certain evidence; whether the court abused its discretion in denying appellant leave to file an amended complaint; and whether the court properly awarded attorneys' fees.

## STANDARD OF REVIEW

 In reviewing a grant of summary judgment, our task is identical to that of the trial court. *State ex rel. Edwards v. Heimann,* 633 F.2d 886, 888 n. 1 (9th Cir. 1980). Viewing the evidence in the light most favorable to the party against whom summary judgment is granted, we must determine *de novo* whether there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. *Heiniger v. City of Phoenix,* 625 F.2d 842, 843 (9th Cir.1980).

## DISCUSSION

I. *Reasonableness of the Limitation Provision*

The repair contract contains an array of limitation clauses,[2] including paragraph 8 which states that no claim under the contract or for tort shall be valid unless written notice is given San Diego Marine within sixty days of redelivery of the vessel and suit is commenced within six months of redelivery. The lower court granted summary judgment on the basis of paragraph 8 only, and the reasonableness of this clause is all that is argued on appeal.

Caribe argues that the limitation provision cannot be reasonable if its effect is to bar claims for latent defects because Caribe's claim could not reasonably have been discovered within the period provided. Car-

ibe cites several non-admiralty cases which support its contention. *See, e.g., Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); *Majors v. Kalo Laboratories, Inc.,* 407 F.Supp. 20 (M.D.Ala.1975). Further, in *Queen of the Pacific,* 180 U.S. 49, 21 S.Ct. 278, 45 L.Ed. 419 (1901), the Supreme Court, in dicta, stated that a provision in a bill of lading requiring that suit for damages be brought within thirty days of the date of the bill would not be enforceable if the loss occurred at sea after the expiration of the thirty-day period, because adherence to the limitation clause would wholly destroy the cause of action. *Id.* at 53, 21 S.Ct. at 279. The clause would be enforceable only if the loss were made known soon enough to bring suit. *Queen of the Pacific,* however, deals with liability to a shipper of goods, and is not a maritime repair case.

Caribe contends that prompt notice was given after the actual discovery of the defect, thus fulfilling the purpose of the limitation clause and disposing of the necessity to comply with the technical contractual requirements. *See Delaware Steel Co. v. Calmar Steamship Corp.,* 378 F.2d 386, 388 (3d Cir.1967).[3] San Diego Marine and Campbell counter by claiming that the parties deliberately allocated the risk of all defects, including latent defects, by the terms of the limitation agreement and that Caribe should be held to the bargain. *See Tokio Marine & Fire Insurance v. McDonnell Douglas Corp.,* 617 F.2d 936 (2d Cir. 1980); *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751 (3d Cir.1976); and

---

**2.** Paragraphs 4 and 5 provide that San Diego Marine's liability for defect in workmanship and material shall extend 60 days from redelivery of the vessel; limit any remedy to repair or replacement; and limit amount of damages to $100,000. Paragraph 6 excludes liability for special or consequential damages, delay or loss of use of the vessel and profits. Paragraph 7 provides that the parties may agree to have San Diego Marine assume additional liability subject to certain restrictions.

**3.** Caribe argues that it should be excused from the limitation provision because of impracticability. It argues that because the defect was

latent and was not discovered until after the limitation period, their failure to abide by the limitation provision was excused. The impossibility or impracticability theory is generally applied to excuse performance of a contract duty or promise. Caribe applies the theory to excuse a condition to the existence of a claim for negligence. Caribe cites no cases to support its theory and we find none. This appears to be an inventive restatement of the argument that the limitation provision is unreasonable if applied to latent defects and is better addressed in that context.

*Iowa Electric Light & Power Co. v. Allis-Chalmers Manufacturing Co.,* 360 F.Supp. 25 (S.D.Iowa 1973). These cases make it clear, however, that the parties may so allocate this risk, but that the parties must clearly intend to do so. We address first the enforceability of limitation clauses generally and then the intent of the parties as evidenced by the contract language.

■ It is well settled that in admiralty law, the parties to a repair contract may validly stipulate that the shipowner is to assume all liability for *all* damage occasioned by the negligence of the shipyard. *See Hall-Scott Motor Car Co. v. Universal Insurance Co.,* 122 F.2d 531, 538 (9th Cir.), *cert. denied,* 314 U.S. 690, 62 S.Ct. 360, 86 L.Ed. 552 (1941); *Newport News Shipbuilding & Dry Dock Co. v. United States,* 34 F.2d 100, 107 (4th Cir.1929). These cases find no violation of public policy in enforcing exculpatory clauses, but rather uphold these clauses as a means to give effect to the expressed intent of the parties. *See Sun Oil Co. v. Dalzell Towing Co.,* 287 U.S. 291, 294–95, 53 S.Ct. 135, 136, 77 L.Ed. 311 (1932). San Diego Marine and Campbell reason that if a clause relieving a repairer from all liability for negligence is valid, then *a fortiori,* a clause agreed to under similar conditions but only limiting liability must also be valid. We find this logic compelling.

■ This circuit recently reaffirmed its *Hall-Scott* decision in *Morton v. Zidell Explorations, Inc.,* 695 F.2d 347 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983), and held that, absent evidence of overreaching, clauses limiting liability in ship repair contracts will be enforced. We are bound by that holding. We find no evidence of overreaching in the present case. Caboz neither objected to nor even mentioned the limitation provision when he signed the standardized contract. Caribe argues that Caboz believed that he was required to sign the standardized contract to regain possession of the vessel and that the form contract was forced on Caboz after it was too late to go elsewhere. Caboz admits, however, that he knew a formal contract would be signed at some point. When presented with it, he assented without complaint to the terms of the agreement.

We now turn to the intent of the parties. The unambiguous language of the contract evidences an intent on the part of the parties to allocate to Caribe the risk of defective repairs discovered after the running of the limitation period. The language does not accommodate the interpretation pressed upon it by Caribe that latent defects were to be excepted from this allocation. Further, the parol evidence rule would exclude proof of an intent not to include the risk of latent defects in the contractual allocation. *See Kalmbach, Inc. v. Insurance Co. of Pennsylvania, Inc.,* 529 F.2d 552, 555 (9th Cir.1976). Therefore, we find summary judgment proper. As we stated in *Sullivan v. Massachusetts Mutual Life Insurance Co.,* 611 F.2d 261 (9th Cir.1979):

> [W]here the claim or defense is predicated upon a written integrated contract that is unambiguous, the parol evidence rule may cut off the presentation of matter that would otherwise raise factual issues and hence summary judgment may be appropriate where in the absence of the parol evidence rule it would not be.

611 F.2d at 264 (quoting 6 *Moore's Federal Practice* ¶ 56.17[11], at 56–778–79 (1976 ed.)).

## II. *Enforceability of the Limitation Provision*

### A. *Consideration*

■ Caribe argues that the contract for the repair of the rudder was formed at the time Caboz assented to the handwritten work proposal. According to Caribe, San Diego Marine was already bound by the prior agreement to perform the rudder repair. Therefore, the standardized form could not modify or supplant the earlier agreement because the latter agreement lacked consideration. Thus, the standardized repair form and the limitation clause therein did not apply to the rudder repair. Caribe's argument is without merit.

Caribe plainly intended that there be numerous repair jobs done on the *American Queen,* not just the rudder repair. Caboz admitted that he knew a formal contract would have to be signed sometime during the progress of the work. The contract itself incorporated by reference all work done up to the time of execution and was backdated to the date when the repairs began. Finally, the contract contains an integration clause indicating that the standardized form was intended as a complete and exclusive statement of the agreement between the parties. All these factors indicate that the parties did not mean to make numerous piecemeal agreements. In giving effect to exculpatory clauses, courts have recognized that it is a practice in the ship repair industry to do repair work before sending an invoice containing the contract for repairs. *See, e.g., Alcoa Steamship Co. v. Charles Ferran & Co.,* 383 F.2d 46, 54–55 (5th Cir.1967), *cert. denied,* 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968); *Hudson Waterways Corp. v. Coastal Marine Service, Inc.,* 436 F.Supp. 597, 604 (E.D.Tex.1977). We find, as a matter of law, that the standardized form contract was supported by consideration and was intended to be the exclusive agreement between the parties covering the repairs on *American Queen.*

■ Even assuming *arguendo* that a separate contract was formed for the rudder repair work, the standardized form contract signed subsequently is a modification or novation of that agreement. The subsequent form contract, by its terms, covered the rudder repair and numerous other repairs to be done after signing. Any performance in addition to that already bargained for serves as consideration for a modification or novation. 1A A. Corbin, *Corbin on Contracts* § 192, at 180 (1963); Restatement (Second) of Contracts § 73 (1979).

### B. Contract of Adhesion

■ Caribe contends that the standardized form is an adhesion contract prepared by San Diego Marine and presented to Caboz on a "take it or leave it" basis.

Provisions in adhesion contracts should not be enforced if assent to them was obtained through unequal bargaining positions wherein the weaker party had no real opportunity to negotiate the terms. *See Standard Oil Co. v. Perkins,* 347 F.2d 379, 383 n. 5 (9th Cir.1965).

Paragraph 7 of the contract, however, explicitly provides that the parties may negotiate, presumably for more money, the extent of liability assumed by San Diego Marine. In addition, as we found above, there is no evidence that San Diego Marine was overreaching or taking undue advantage of Caribe. Caribe simply did not choose, out of ignorance or otherwise, to attempt to negotiate San Diego Marine's liability for negligent repair. This appears to have been a commercial transaction between two business entities. We refuse to rewrite that transaction absent evidence that San Diego Marine or Campbell unfairly exploited a position of advantage.

### III. Applicability of the Limitation Provisions

#### A. Allegations Against Campbell

■ Caribe contends that San Diego Marine was merely the alter ego of Campbell Industries in that Campbell completely controlled, dominated and managed San Diego Marine, a wholly-owned subsidiary of Campbell. On the basis of this contention, Caribe argues that Campbell is equally liable with San Diego Marine for the allegedly negligent repair, and because Campbell was not a party to the repair contract, the cause of action as to Campbell should not be affected by the limitation provision.

To disregard San Diego Marine's corporate existence, however, there must be more than just its control by Campbell. There must be factors that indicate a disregard of San Diego Marine's corporate form, *e.g.,* commingling of funds or disregard of legal formalities. Further, it must appear that injustice will result from recognizing San Diego Marine as a separate entity and that Campbell had a fraudulent intent or an intent to circumvent statutory or contractual obligations in its control of San Diego

Marine. *See Audit Services, Inc. v. Rolfson,* 641 F.2d 757, 764 (9th Cir.1981); *Von Brimer v. Whirlpool Corp.,* 362 F.Supp. 1182, 1194 (N.D.Cal.1973). Caribe gives no evidence of these factors. Mere allegations that San Diego Marine is the alter ego of Campbell are insufficient to withstand summary judgment.

Further, if Caribe's alter ego theory were correct, Campbell would be liable only if San Diego Marine were also liable. As the court stated in *Fuls v. Shastina Properties, Inc.,* 448 F.Supp. 983 (N.D.Cal.1978), "Where the alter ego doctrine applies, therefore, the two corporations are treated as one for purposes of determining liability. It follows that where the one corporation is released from liability, so too is the other." 448 F.Supp. at 989. Thus, even if San Diego Marine was in fact the alter ego of Campbell, it would be released from liability under the standardized forms signed by Caboz.

### B. Gross Negligence

■ Caribe argues that even if the limitation provision is reasonable and enforceable, it should not be construed to limit San Diego Marine and Campbell's liability where gross negligence is alleged. *See Lykes Bros. Steamship Co. v. Waukesha Bearings Corp.,* 502 F.Supp. 1163, 1172 (E.D.La.1980); *Todd Shipyards Corp. v. Turbine Service, Inc.,* 467 F.Supp. 1257, 1298 (E.D.La.1978), *modified,* 674 F.2d 401 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 447–48, 74 L.Ed.2d 602 (1982); 6A A. Corbin, *Corbin On Contracts* § 1472 (1962). The applicability of a limitation provision to gross negligence is a matter of first impression in this circuit. We need not decide here, however, whether a finding of gross negligence would preclude enforcement of a limitation provision like that presently under litigation. Caribe has failed to allege sufficient facts to present even a triable issue as to the presence of gross negligence.

In the *Todd* case, cited by Caribe as support for its contention, the Fifth Circuit stated the standard for finding gross negligence. To avoid the limitation provision, there must be "'harm wilfully inflicted or caused by gross or wanton negligence'" amounting to "inflicting an intentional tort, or ... damages ... caused by a wanton disregard of [the repairer's] responsibility under the contract or the duty owed by it to the Owners." *Todd,* 674 F.2d at 411 (quoting 6A *Corbin on Contracts* § 1472 (1964 ed.)). Even accepting as true Caribe's allegation concerning the conduct of San Diego Marine and Campbell, we find no basis for a finding of gross negligence.

### C. Active Negligence

■ Caribe argues that the limitation provision does not apply to their allegations of active negligence on the part of appellees. Active negligence involves *participation* in the conduct or omission that causes the injury. *Celli v. Sports Car Club of America, Inc.,* 29 Cal.App.3d 511, 519, 105 Cal.Rptr. 904, 909–10 (1972). Caribe contends that the limitation provision must expressly provide for active negligence to be valid against such negligence, and cites numerous indemnification cases. Caribe then argues that there is a triable issue of fact as to the presence of active negligence. San Diego Marine and Campbell argue that the distinction between active and passive negligence applies only to indemnity contracts and not to exculpatory clauses. They cite maritime cases which have upheld exculpatory clauses against active negligence even though not expressly provided for. *See Hall-Scott Motor Car Co. v. Universal Insurance Co.,* 122 F.2d 531, 533 (9th Cir.), *cert. denied,* 314 U.S. 690, 62 S.Ct. 360, 86 L.Ed. 552 (1941); *Hudson Waterways Corp. v. Coastal Marine Service, Inc.,* 436 F.Supp. 597, 607 (E.D.Tex.1977).

■ The limitation provision provides that "no claim arising from this transaction" is valid unless brought under the requirements of the clause. This language is sufficiently broad to cover active negligence. An exculpatory clause involving the repair of a vessel by its very nature must be intended to cover active negligence. It would only be in remote circumstances that passive negligence would be contemplated.

We hold that the active/passive rule has no application to this maritime provision for limitation of liability. *Cf. Transcontinental Gas Pipe Line Corp. v. Mobile Drill, Barge,* 424 F.2d 684, 692 n. 7 (5th Cir.), *cert. denied,* 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970).

## IV. *Admissibility of Evidence*

■ Caribe contends that the district court relied on inadmissible evidence in finding that the limitation provision was reasonable. Caribe raises issues of relevancy and authentication. Decisions of the trial court regarding the relevancy of evidence are reviewable only for abuse of discretion. *United States v. Burreson,* 643 F.2d 1344, 1349 (9th Cir.), *cert. denied,* 454 U.S. 830, 847, 102 S.Ct. 125, 165, 70 L.Ed.2d 106, 135 (1981). Whether evidence is properly authenticated is a question of law subject to *de novo* review.

### A. *Unpublished District Court Orders*

At trial, San Diego Marine and Campbell presented to the district court two unpublished orders from the same judicial district in unrelated actions in which San Diego Marine's standardized limitation provisions were found to be reasonable. *See Zeta Fishing Co. v. San Diego Marine Construction Corp.,* Civ. No. 74–403–N (S.D.Cal. 1976); *Security Pacific National Bank v. Durso,* No. 71–113–T (S.D.Cal.1973). Caribe argues that this was improper. Because the reasonableness of a contract provision must rest on the factual circumstances of each individual case, Caribe argues that the prior orders should not have been used to support the reasonableness of the contract provision in the present case.

■ As a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it. 29 Am.Jur.2d *Evidence* § 58 (1967); *cf. Guam Investment Co. v. Central Building, Inc.,* 288 F.2d 19, 23 (9th Cir.1961). But a court can properly notice a doctrine or rule of law from such prior case and apply that principle under the theory of stare decisis. 29 Am.Jur.2d *Evidence* § 58, at 92 (1967).

■ The record indicates that the district court used the disputed orders solely to identify general policy considerations relevant to the reasonableness of the limitation provisions. The district court found that the courts in the prior actions upheld the limitation provisions as beneficial to cut off the indefinite potential liability of ship repair contractors for claims that may arise in inaccessible locales, and to make ship owners vigilant and swift in discovering defective repairs. There is no indication that the district court upheld the applicability of the provision as reasonable in the present case solely because prior courts had done so. We find no abuse of discretion in the district court's use of these orders.

### B. *Contracts Of Other Repair Facilities*

■ San Diego Marine and Campbell also offered in support of their motion for summary judgment standard ship repair contracts used at other ship repair yards (including appellee Campbell) in an effort to show custom and practice with regard to limitation of liability in the ship repair industry. Caribe argues that these contracts were inadmissible evidence and thus improperly relied upon by the trial court because of lack of authentication and lack of relevancy to the present case.

Evidence of custom and practice in the ship repair industry is certainly relevant to this case. Such evidence shows what provisions other repair facilities make for allocating the risk of latent defects in repairs on marine vessels. *See* 2 J. Wigmore, *Evidence* § 461 (Chadbourne rev. 1979). This is not to say that we condone use of industry custom and practice as fixing the legal standard for reasonableness in marine repair contracts. *Id.* We would disapprove use of industry custom by a party to a contract containing unreasonable terms to justify those terms simply by showing that others in the industry use similar terms. There is no evidence that the trial court misused these contracts in that way.

The record indicates that the affidavit authenticating the contracts technically may not have complied with the standard set out in *United States v. Dibble,* 429 F.2d 598 (9th Cir.1970). The documents appear, however, on the face to be what their proponents propose them to be. And the trial court, sitting in admiralty without a jury, was able to assess the probative value of these contracts without the danger of prejudice to Caribe. Further, Caribe has failed to show how its substantial rights have been affected by admitting the contracts. *See* Fed.R.Evid. 103(a). We conclude that any error in admitting the evidence of custom and practice in the ship repair industry was harmless. *See Hill v. Rolleri,* 615 F.2d 886, 890 (9th Cir.1980).

## V. *Denial of Leave to Amend Complaint*

After San Diego Marine and Campbell moved for summary judgment but before hearing on the motion, Caribe sought leave to amend its complaint to allege fraud and breach of a duty to disclose on the part of San Diego Marine. The motion to amend was based on the fact that San Diego Marine performed repairs on the *American Queen* in the area of the rudder about one year after the original rudder repairs. Caribe argues that in performing the subsequent repairs appellees discovered, or should have discovered, that the rudder had been improperly repaired the year before but failed to inform Caribe. The trial court refused leave to amend.

■■■ Under the Federal Rules of Civil Procedure, leave to amend should be freely granted when justice so requires. *United States v. Hougham,* 364 U.S. 310, 316, 81 S.Ct. 13, 17, 5 L.Ed.2d 8 (1960); *Howey v. United States,* 481 F.2d 1187, 1190 (9th Cir. 1973). The trial court's denial of leave to amend a complaint, however, is reviewable only for an abuse of discretion. *Zenith Radio Corp. v. Hazeltine Research Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971).

■■■ In the present case the trial court relied on a number of factors in denying leave to amend. It found that there was a delay in making the motion of one and one-half years after the case was filed. No facts, newly discovered in that period, were alleged. The new allegations would totally alter the basis of the action, in that they covered different acts, employees and time periods necessitating additional discovery. Finally, a motion for summary judgment was pending and possible disposition of the case would be unduly delayed by granting the motion for leave to amend. These factors form the basis of a proper exercise of discretion by the trial court in refusing to allow amendment. *See, e.g., Glesenkamp v. Nationwide Mutual Insurance Co.,* 71 F.R.D. 1 (N.D.Cal.1974), *aff'd per curiam,* 540 F.2d 458 (9th Cir.1976); *Kirby v. P.R. Mallory & Co.,* 489 F.2d 904, 912 (7th Cir. 1973), *cert. denied,* 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974).

## VI. *Award of Attorneys' Fees*

■■■ The district court awarded attorneys' fees to San Diego Marine and Campbell pursuant to a clause in the standardized repair contract providing for such an award to the prevailing party in a legal action to enforce the contract. Caribe argues that the contract clause cannot be the basis for an award of attorneys' fees because the repair of the rudder is covered by an agreement entered into prior to execution of the standardized form. They argue that the contract was formed when Caboz assented to the handwritten document proposing the rudder work. This contract made no provision for attorneys' fees. As we found above, however, appellants' arguments based on some contract formed outside the scope of the standardized form are without merit.

The trial court properly found that Caribe's action was, at least in part, a suit on a contract containing an express provision for award of attorneys' fees to the prevailing party. The district court's order indicates, however, that the court awarded attorneys' fees to both San Diego Marine and Campbell on the contract clause. This was error because Campbell was not a party to the contract containing the award provision. It

is not possible from the record to determine how much of the fee award pertained to the defense of Campbell. Therefore we must remand to the district court to reduce the award of attorneys' fees by that amount attributable to Campbell's defense.[4]

Accordingly, we affirm except as to the award of attorneys' fees, and remand to the district court for recalculation of that award.

---

**4.** San Diego Marine and Campbell also argue that they are entitled to attorneys' fees under a California state statute. Cal.Civ.Code § 1717. We need not decide whether a state statute provides a basis for awarding attorneys' fees in this case brought under federal admiralty jurisdiction. San Diego Marine and Campbell did not raise the California statute below and the trial court did not address it. We decline to address this issue for the first time on appeal. *See Rothman v. Hospital Serv.*, 510 F.2d 956, 960 (9th Cir.1975).